UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :

                    v.                          :                    Case No. 23-342-JEB

PETER KRILL, Jr.                          :

_____


## DEFENDANTS SENTENCING MEMORANDUM

Peter Krill, through his attorney Maggie F. Moy, Assistant Federal Public Defender, District of New Jersey, respectfully submits this sentencing memorandum on his behalf for this Court's consideration at his sentencing hearing scheduled for Friday, February 9, 2024 at 2:00 p.m.  For the reasons set forth below, defense counsel submits that a sentence of 10 months' home detention as part of a 34-month term of probation, to include 250 hours of community service and $2000 restitution, is sufficient but not greater than necessary to satisfy both the mandate and purposes of 18 U.S.C. § 3553(a).

## Procedural History

On December 14, 2022, a sealed complaint was filed against Peter Krill, Jr..  The complaint charged Mr. Krill with participating in the January 6, 2021 attack on the Capitol.  On December 15, 2022, Mr. Krill was arrested on a warrant signed by U.S. Magistrate Robin M. Meriweather. Following his arrest in New Jersey, Mr. Krill

voluntarily gave a taped confession, admitting that he participated in the Capitol riot, identifying photos of himself and videos he posted.  That same day, he appeared by videoconference for his initial appearance in the District of New Jersey.  Counsel was appointed, and Mr. Krill was released on an unsecured bond with conditions of release. On December 22, 2022, Mr. Krill appeared before U.S. Magistrate Judge Moxila A. Upadhyaya for his first appearance in this District.  Defense counsel was again appointed and Mr. Krill was continued on bail with conditions.

On October 10, 2023, Mr. Krill appeared before Your Honor, waived indictment, and pled guilty to one-count information charging him with civil disorder, in violation of 18 U.S.C. § 231(a)(3).  A presentence report was ordered, and sentencing was scheduled for January 9, 2024.   Counsel filed a consent motion to continue sentencing and this matter was rescheduled for February 9, 2024.  On January 5, 2024, the draft report was completed and Mr. Krill, through counsel, provided minor typographical corrections to the report.  The final presentence report was filed on February 2, 2024.

## Guideline Calculations

Both parties are in agreement with the guideline calculations in the presentece report (PSR) prepared by the US Probation Office.  Mr. Krill's criminal history category is II, his total offense level is 11, and his advisory guideline range is 10 to 16 months.  *See* ¶¶ 39, 50, and 98.

## APPLICATION OF 18 U.S.C. § 3553(a) TO MR. KRILL

As this Court is aware, the procedural requirements of post-*Booker*[1] sentencing are well established.  Briefly, sentencing courts must (1) properly calculate the Guideline range; (2) rule on any departure motions made under the Guidelines; and (3) exercise post-*Booker* discretion by choosing a sentence in light of all relevant § 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the Guidelines."  *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).  The Court's final determination on a sentence must reflect "§ 3553(a)'s overreaching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." *United States v. Kimbrough*, 128 S.Ct. 558, 575 (2007). Those purposes can best be summarized as punishment, deterrence, incapacitation, and rehabilitation.

The "sufficient, but not greater than necessary" requirement is often referred to as the "parsimony provision."  The parsimony provision is not simply another factor to be considered along with the others set forth in § 3553(a); it actually imposes a separate and independent limit on the sentence a court may impose.  See *United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (since § 3553(a) requires the sentence to be no greater than necessary to meet four purposes of sentencing, imposition of a sentence greater than necessary to meet those purposes is

---

[1] *United States v. Booker*, 543 U.S. 220 (2005).

reversible, even if within the guideline range). Thus, under § 3553(a), courts are required to impose a sentence below the guideline range if such a sentence would be sufficient to achieve the purposes of sentencing.

In applying the § 3553 factors to Mr. Krill and the instant offense, counsel submits that a sentence of 10 months' home detention as part of a 34 month term of probation, to include 250 hours of community service and $2000 restitution, satisfies both the mandate and the purposes of the statute. Enclosed with this sentencing letter and incorporated as part of counsel's argument is are 25 letters, along with photographs, collectively identified as Exhibit A. These letters are from Mr. Krill, his wife, his family members and in-laws, and members of the community, including several former and current law enforcement officials. The letters and photographs speak for themselves and provide the Court with a true understanding of the man Peter Krill was and who he is now.

## The Nature and Circumstances of the Offense

### The Events of January 6th and Mr. Krill's Actions

On January 6, 2021, a large crowd gathered to hear then-President Donald Trump hold his last rally on the National Mall. The theme of the rally was "Stop the Steal," which was a clear reference to the former President's claim that the presidential election results from November 6, 2020 were invalid. It is estimated that over 10,000 Americans from all over the country came to hear and see the President. When he concluded speaking, many of these people went home, however, thousands decided to take the President's

encouragement to go to the Capitol.  They believed his claim that he would join them there to protest their discontent with the election results and their legitimacy.  As we now know, many of these protesters were intent on rioting and obstructing the election process through violent, destructive, and illegal means.  This included many who came with weapons, plans, and agendas to cause utter chaos in organized numbers.  Peter Krill was not one of those rioters.

Peter Krill came to Washington, DC that day to see Donald Trump, whom he supported and respected.  When he arrived in Washington on the morning of January 6, 2021, he never intended to participate in a riot or attack on the Capitol.  To the contrary, he believed that members of Antifa would be present and that *he* would be the target of *their* violence.  He wore a helmet and goggles to protect himself.  He had no weapon.  He never imagined that it would be supporters of the President who would instigate the violence.  More importantly, he never anticipated, planned, or intended to violate the law himself.  After having turned his life around at the age of 42, for the first time in a decade, Mr. Krill failed to use the tools of recovery that now govern his daily life.  Mr. Krill got swept away by the emotions of the mob, and with it, so too did his good judgment.  He is mortified by his behavior and completely regrets his conduct. He continues to be contrite and accepts that his conduct will come with criminal sanctions.

It is undisputed that Mr. Krill's actions that day were unlawful.  His acceptance of the Statement of the Offense, drafted by the government, was immediate and sincere.

The nature of his actions, however, especially in comparison to others in the crowd, must also be understood and considered.  The only affirmatively aggressive action he took was at the bike rack barriers on the West Front of the Capitol grounds.  At 1:35 p.m., he briefly grabbed the bike rack and pulled backwards.  His hands were on the bike rack for a matter of a seconds.  But that action allowed other protestors to push into officers, before they were pushed back behind the barricade by those same officers.  Mr. Krill engaged in no physical contact – or verbal interaction – with the officers at the bike rack, or anywhere else that day.  About 20 minutes later, Mr. Krill made his way to the scaffolding on the northwest side where he took the videos he posted to TikTok (*see* Govt's Exhibits B and C).  From that location, he made his way to the Upper West Terrace Door and entered the Capitol, eventually entering the Rotunda.  Police offers entered the Rotunda around 3 pm while Mr. Krill was still present.  Govt's Exhibit D clearly shows that he did not leave immediately upon request.  But it shows much more than that.  Mr. Krill's conduct is remarkably different from many of the other rioters.  He did not push, hit, or assault any officers in any way.  Mr. Krill was nearly silent the entire time he was in the Rotunda. Unlike many others, Mr. Krill never threatened any officer, nor was he verbally abusive or offensive in any way; he merely tried to stand his ground before finally acquiescing and leaving the Rotunda and the Capitol itself.

## Mr. Krill's History and Characteristics

Peter Krill's life can be split into two halves: before sobriety and after sobriety. As a teenager, he started using drugs, was in and out of treatment, left his parents' home at 16, and became a transient, often-homeless drug user. By the age of 18, he had a felony conviction for breaking into a car and stealing items. That pattern continued through his 20s, and even into his 30s, when he was arrested for what he believed would be the last time, in 2004. As he describes in his letter to the Court, while serving that last sentence, his parents came to see him. He often describes how hard that visit was, for both him and his parents. They were getting older, raising Pete's son who they had adopted. Little did the three of them know how little time they had left together. But that visit changed the trajectory of his life. He committed to changing his life. Within a year or so, he finally earned his GED – at 40! But that was not the only change. He committed to sobriety and for the first time, he took up, embraced, and learned the tools necessary to live a life of a recovering addict. He was released from prison on October 15, 2009, but his sentence was not complete until he finished his three-year term of NJ state parole in October 2012.[2]

By the time he was paroled, he had already started corresponding with Estelle "Stel" Messenger. They began dating, and in 2013, they were married. They are both recovering addicts and have built a life together on that foundation: recovery and

---

[2] After closer inspection, counsel realized ¶49 of the PSR contains one error: Mr. Krill *completed his three year term of NJ State Parole on October 15, 2012*, but his release from custody was three years earlier.

sobriety.  The letters from their friends and family are a testament to how they changed their own lives and each other's.   Each and every day, Pete gets up and texts a group of men with a daily affirmation to help him and them in their recovery.  He has helped family members, friends, and even strangers either obtain sobriety or maintain it.  He changed his life by a complete 180 degrees.  He is active in the community, including being a panelist at the December 13, 2017, "Reprimand or Rehab" program at Rowan University.  *See* Exhibit B, video of Mr. Krill discussing vocational opportunities and the NJ Department of Corrections.

Mr. Krill has spent every day since leaving prison in 2009 dedicated to maintaining his sobriety.  His long success is built on recognizing potential triggers and using the tools that AA has taught him to avoid and prevent relapse.   Yet, despite all that he accomplished in the last 15 years, the one thing Mr. Krill never thought he was at risk of was engaging in criminal conduct again.  He had settled down.  Made amends with his family.   Created a new, large, blended family with his wife Stel.  He started doing construction and renovation work for friends and family, and has developed a good reputation within the community.  His criminal history was always connected to his drug use.  But when Mr. Krill traveled to Washington, DC on January 6, he did not recognize that the events of that day were also a trigger.  He let his emotions and those of the crowd overcome his better judgment.  While he did not physically accost any officer, verbally abuse anyone, or even taunt any law enforcement, he knows his actions were inexcusable.

Since Mr. Krill's arrest, he has complied fully with pretrial supervision. He is described by his friends and family as contrite and regretful. He severed ties with those with whom he traveled to Washington, DC that day. As evidenced by the letters submitted by several members of law enforcement, he respects police authority, and the necessity and value police bring to our society. Mr. Krill accepts that punishment and sanctions are warranted and respects this Court's ultimate decision. Counsel submits that the nature of Mr. Krill's actions that day, while certainly unlawful, involved no violence, no threats, and no vitriol toward any officer. When coupled with the life he has led for the last 15 years, helping others turn from a life of addiction and embrace sobriety and contribution, the need for a sentence of imprisonment to deter, incapacitate and rehabilitate is not necessary.

Yet the need for just punishment remains a factor for this Court to weigh and consider. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see* also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Finally,

the need for rehabilitation cannot be met by jailing Mr. Krill more than necessary. "Imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Accordingly, these factors weigh heavily in favor of a sentence below the advisory guideline range.

### The Need to Avoid Unwarranted Sentencing Disparities

Another factor supporting a downward variance is 18 U.S.C. § 3553(a)(6) which directs courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* The government raises three other January 6 defendants to support their request for a within guideline sentence: Moses Romero, Ronnie Presley, and Narayana Rheiner. Yet they acknowledge that both Romero and Presley physically grabbed and pulled on officers, neither of which Mr. Krill did. The government's claim that Mr. Krill's actions were more egregious is simply belied by the facts. Mr. Krill did not push the bike rack into any officer, he pulled it backward and immediately let go. He did post two short videos of what he observed from the grandstands on TikTok, but those videos were no different from what was being broadcast on every television station across the country and being viewed by millions in contrast to Mr. Krill's videos which were less than 90 seconds, combined. Finally, Mr. Krill's attempts to stand his ground when being pushed back by officers in the Rotunda demonstrated his utter lack of aggression. Again, his demeanor

was markedly different from others in the Rotunda.  While he did not leave immediately, he did acquiesce, and left peacefully and without any threats or violence.

As for Rheiner, the government suggests that they are similar because they each have an extensive record, but the government ignores the fact that Mr. Krill's last arrest was nearly 17 years earlier.  More importantly, unlike Rheiner, Mr. Krill was <u>not</u> on supervision at the time of the instant offense; to the contrary, he completed his parole in 2012 and had not incurred any arrests since 2004.  Further, Rheiner, unlike Mr. Krill, deliberately engaged in physical contact with officers.  *See* Rheiner Govt Sent Memo, Dkt. Entry 34, p 2.  According to the government, Rheiner grabbed an officer's riot shield, pulling it from the officer after a struggle, causing the officer to fall downs several steps before landing on the ground.  *Id*.  In no way are his actions or criminal history similar or comparable to Mr. Krill's.

The government is correct about one thing, however, no other "case contains the same balance of aggravating and mitigating factors" present in Mr. Krill's case.  Frankly, that is true in almost every sentencing.  Counsel suggests rather than splitting hairs about individual facts of each case, this Court should consider the frequency of below guideline sentences of other defendants charged exclusively or primarily with a violation of § 231(a)(3), especially those whose total offense level was 11 based on the § 231(a)(3) offense.  Defendants such as:

- Aaron Mostofsky, 1:21-cr-00138-JEB whose offense level was 13, CHC I, guideline range 12-18 months, and was sentenced to 8 months' incarceration;

- David Blair, 1:21-cr-00186-CRC whose offense leve was 11, CHC I, guideline range 8-14 months, and was sentenced to 5 months' incarceration;

- Robert Fairchild, Jr, 1:21-cr-00551-TFH, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 6 months' incarceration;

- John Gordon, 1:21-cr-00343-RC, whose offense level was 11, CHC III, guideline range 12-18 months, and was sentenced to 6 months' incarceration;

- Geoffrey Shough, 1:22-cr-00197-DLF, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 6 months' incarceration;

- Bernard Sirr, 1:22-cr-00259-TNM-1, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 2 months' incarceration;

- Luke Lints, 1:22-cr-00259-TNM-2, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 4 months' incarceration;

- Jonathan Rockholt, 1:23-cr-00104-TNM, whose offense level was 11, CHC II, guideline range 10-16 months, and was sentenced to 5 months' incarceration;

- Brian Peller, 1:23-cr-00045-TNM-1, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 60 months' probation, with 8 months location monitoring;

- James Davis, 1:21-cr-00595-TJK, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 2 months incarceration and 6 months home detention;

- Larry Giberson, 1:23-cr-00115-CJN, whose offense level was 11, CHC I, guideline range 8-14 months, and was sentenced to 2 months incarceration and 6 months home detention; and

- Joseph Pavlik, 1:23-cr-00045-TNM-3, whose offense level was 12, CHC I, guideline range 10-16 months, and was sentenced to 60 days incarceration plus 6 months home detention.

No two cases are exactly alike, but the list above makes it clear that imposition of a within-guideline sentence is not the norm for January 6 defendants charged solely or primarily with civil disorder. To the contrary, most have been sentenced one or more levels lower than the calculated offense level. While most have received a term of imprisonment, at least one other, Brian Peller, received a lengthy term of probation with location monitoring. Several others also received terms of home detention. Based on the specific facts of Mr. Krill's case, counsel submits that in order to avoid an unwarranted sentencing disparity, a sentence below the guidelines is warranted in this matter.

### Mr. Krill's Medical Considerations Warrant a Non-Custodial Sentence

In addition to the other reasons set forth above, there is one more factor which supports a non-carceral sentence for Mr. Krill. As the set forth in the presentence report,

Mr. Krill suffers from several chronic and severe medical conditions.

Mr. Krill has several other medical issues.  He suffers from carpal tunnel in both wrists, for which he recently underwent two surgeries to fuse his wrists.  He has several bulging discs and suffers from chronic pain in both shoulders due to rotator cuff injuries. Because he is a recovering addict, he cannot take any prescription pain medication for more than a day or two.  Anything longer and he is at risk for relapse.  Mr. Krill's pain has increased over the years.  Over the years, he sought alternative methods to relieve his pain:  chiropractic medicine, acupuncture, cryo-chamber treatment, trigger-point injections, nerve-burning; all to no avail.  Sometime in 2017, the increased pain became

intolerable, and he finally agreed with his doctor's advice and obtained a medical marijuana card.  He had been reluctant to do so; medical marijuana is frowned upon by old-school AA members, and he did not want to risk his sobriety, but the pain had become unmanageable.  The medical marijuana was the first treatment to help relieve his pain, and more importantly, did not act as a trigger for drug relapse.  When he was arrested on the instant offense, it did not occur to him to mention his medical card. Sometime after his first appearance in this district, the issue was raised and he was told he could no longer use medical marijuana.  Mr. Krill accepted the order of the magistrate judge and tried to cope as counsel researched his legal options.  Within a matter of weeks, Mr. Krill was in excruciating pain.  Both he and his wife acknowledge that when he is unable to obtain pain relief, he withdraws, becomes easily frustrated, and unable to cope with activities of daily living.  His wife thought he was at the breaking point when counsel's legal research came upon Marinol, or Dronabinol, a synthetic form of tetrahydrocannabinol (THC), the main psychoactive ingredient found in marijuana. Dronabinol is available by prescription and is known to reduce neuropathic pain. Unfortunately, and not surprisingly, it is not on the BOP's formulary of approved drugs. Mr. Krill will be unable to receive Dronabinol if he is incarcerated.  Without it, he will be subject to excruciating pain day after day.  Not only is he terrified of what it will do to his body and mind, his greatest fear is its impact on his sobriety.  For Mr. Krill, a sentence of incarceration means a sentence of prolonged physical and mental pain, putting him at

risk of relapse should he need to use prescription pain medication for any extended period.

<u>**CONCLUSION**</u>

If this Court believes that the only just sentence must include a term of incarceration, counsel requests that the Court impose a sentence of intermediate punishment, specifically weekend sentences, for whatever length of time this Court believes is appropriate.

. Further, imposition of weekend sentences will allow Mr. Krill to continue using Dronabinol during the week. While he will still experience significant pain as he serves each weekend sentence, it will not have the same dire consequences that living without any pain management for months at a time would.

For the reasons stated above Peter Krill respectfully requests that the Court impose a sentence of 10 months' home detention as part of a 34-month term of probation, to include 250 hours of community service and $2000 restitution.

<div style="margin-left: 40%;">
Respectfully submitted,
*s/ Maggie F. Moy*
MAGGIE F. MOY
Assistant Federal Public Defender
800 Cooper Street. Suite 350
Camden. NJ 08102
maggie_moy@fd.org
(856) 757-5341
</div>